IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
SOUTHERN DIVISION
No. 7:21-cv-25

DANIEL MCCARTHY; and PHILIP
SCALZO;

     *Plaintiffs*,

       v.

ACTIVE ENERGY GROUP, PLC;
LUMBERTON ENERGY HOLDINGS
LLC; ADVANCED BIOMASS
SOLUTIONS, PLC; *and* ACTIVE ENERGY
RENEWABLE POWER, LLC;

     *Defendants.*

**RESPONSE IN OPPOSITION TO
DEFENDANTS' MOTION TO DISMISS**

# TABLE OF CONTENTS

TABLE OF CONTENTS ........................................................................... 2

NATURE OF THE CASE ........................................................................ 3

STATEMENT OF FACTS ...................................................................... 4

   I.    The Nature of McCarthy's and Scalzo's Employment with AEG ................................. 4

   II.   AEG Induces McCarthy and Scalzo to Agree to a Delayed Payday ............................ 5

   III.  McCarthy and Scalzo Continue Working and Withhold Wage Actions on AEG's False Pretenses ............................................................................................... 6

STANDARD OF REVIEW ....................................................................... 7

ARGUMENT ...................................................................................... 8

   I.    AEG is Subject to Obligations under the Utah Payment of Wages Act ........................ 8

     A.   The Utah Payment of Wages Act Prescribes Numerous Employer Obligations ........ 8

     B.   An Employment Agreement Does Not Exempt an Employer from its Obligations under the Act ...................................................................................... 9

   II.   McCarthy's and Scalzo's Employment is Subject to the Fair Labor Standards Act ..... 11

     A.   Exemptions under the FLSA ................................................................. 11

     B.   The Duties Test is a Fact-Specific Inquiry, which AEG Fails to Satisfy ................. 13

     C.   The Salary-Level Test Requires *Actual* Compensation (not *Promises* of Compensation), which AEG Fails to Show .............................................. 15

   III.  AEG is Bound by the Utah Minimum Wage Act ....................................... 17

     A.   The Utah Minimum Wage Act Expressly Applies in the *Alternative To* (Not in *Tandem With*) the FLSA ...................................................................... 17

     B.   Statute of Limitations.......................................................................... 18

       1.   Equitable Estoppel / Tolling .............................................................. 18

       2.   AEG's Promises to Pay the Debt Renew the Statute of Limitations ................ 20

   IV.   Attorney's Fees.................................................................................... 21

CONCLUSION ................................................................................... 21

CERTIFICATE OF SERVICE ................................................................ 23

CERTIFICATE OF WORD COUNT ......................................................... 24

Case 7:21-cv-00025-D   Document 23   Filed 08/16/21   Page 2 of 24

Pursuant to Local Rules 7.1(f) and 7.2, Plaintiffs DANIEL McCARTHY ("**McCarthy**") and PHILIP SCALZO ("**Scalzo**") (collectively, "**Plaintiffs**"), by and through counsel, hereby submit this *Response in Opposition to Defendants' Motion to Dismiss* in response to the *Motion to Dismiss* and the *Memorandum in Support* filed on behalf of Defendant Active Energy Group, PLC ("**AEG**") and Advanced Biomass Solutions, PLC ("**ABS**") (collectively, "**Defendants**" or "**AEG**" in reference to its common enterprise with all defendants).

## <u>NATURE OF THE CASE</u>

McCarthy and Scalzo are two former employees of Active Energy Group, PLC who — after being paid for approximately 16 months of employment — were not paid their subsequent eight months' wages and expense reimbursements before being suddenly terminated. (Doc. 1, ¶¶18-36). McCarthy and Scalzo continued to work despite AEG's non-payment of their wages based on AEG's false pretenses of its inability to pay and on false assurances of the future condition on which the back wages would be paid (i.e., additional investment into the company). (*Id.*, ¶30).

That condition would come and pass without disclosure. (*Id.*, ¶32). Instead of paying the back wages at that time, AEG let McCarthy and Scalzo continue working without pay until AEG suddenly terminated them after eight months of unpaid wages. (*Id.*, ¶¶33-35). Upon doing so, AEG acknowledged in writing the respective amounts owed to each McCarthy and Scalzo. (*Id.*, ¶¶34-35). To McCarthy, AEG acknowledged $101,599.54 of back wages and expenses; to Scalzo, AEG acknowledged $58,956.93[1] of back wages and expenses. (*Id.*). Yet neither at that time, nor at any time since, did AEG pay or tender any portion of said wages and expenses. (*Id.*, ¶¶34-46).

Instead, AEG sought to shuffle its assets through its various alter egos and out of McCarthy's and Scalzo's home state of Utah. (*Id.*, ¶¶38-41).

---

[1] AEG omitted an additional $1,159.82 owed to Scalzo for expenses incurred in 2019. All told, AEG owes $60,116.75 in principal unpaid wages and unreimbursed expenses to Scalzo. (Doc. 1, ¶35).

Today, AEG attempts to preclude McCarthy and Scalzo from exercising the statutory remedies available to them to collect their wages. McCarthy and Scalzo were employees who were not paid by their employer and fall squarely within the class of individuals that state and federal wage statutes were designed to protect. (*Id.*, ¶1, ¶15, ¶20, ¶26, ¶¶34-35, ¶¶69-71, ¶83-85, ¶87).

## STATEMENT OF FACTS

### I. The Nature of McCarthy's and Scalzo's Employment with AEG

Plaintiffs Phil Scalzo and Daniel McCarthy first began their relationships with AEG on or about February 1, 2017. (*Id.*, ¶¶8-9, ¶18, ¶24). Internally, AEG designated McCarthy and Scalzo as independent contractors, citing the difficulty of paying them through a U.K. company. (*Id.*, ¶20, ¶26). However, at all relevant times, McCarthy and Scalzo were direct employees of AEG as a matter of law. (*Id.*). Their titles were the Chief Technology Officer and the Vice President of Engineering, respectively. (*Id.*, ¶¶19-20, ¶¶25-26).

AEG is a for-profit public limited company, incorporated under the laws of England and traded on the AIM sub-market of the London Stock Exchange. (*Id.*, ¶10). AEG holds itself out as "a producer of biomass products focused on the utilization (sic) of low cost and waste biomass materials that create higher value, energy efficient and carbon neutral fuels." (*Id.*, ¶10). AEG has alter egos and instrumentalities all over the world, including most relevantly across various U.S. states, including North Carolina and Utah.[2] (*Id.*, ¶1, ¶¶3-4, ¶¶10-13, ¶17).

McCarthy and Scalzo resided in Utah throughout their tenure with AEG. (*Id.*, ¶¶8-9). They spent much of their time traveling to remote job sites around the world. (*Id.*, ¶¶8-9, ¶17, ¶33). Notwithstanding the alter-ego entities in any locale or the entity named on McCarthy's and

---

[2] The alter egos relevant to the case at hand include *inter alia* Lumberton Energy Holdings LLC (a non-movant defendant organized in North Carolina on February 28, 2019), Active Energy Renewable Power, LLC (a non-movant defendant organized in North Carolina law on October 10, 2018, and Advanced Biomass Solutions, PLC, (a co-movant defendant incorporated in England). (Doc. 1, ¶¶11-13).

Scalzo's paychecks, both McCarthy and Scalzo always remained direct employees of AEG, were paid and funded by AEG, and followed the exclusive directives and orders of AEG's management team. (*Id.*, ¶20, ¶26). Pursuant to Utah law, McCarthy and Scalzo were to be paid on a regular monthly or semimonthly basis. (*Id.*, ¶¶19-26).

As AEG's Chief Technology Officer, Scalzo reported to AEG's executive management team, including but not limited to Richard Spinks (AEG CEO), Brian Evans-Jones (AEG CFO, *in addition to* ABS CEO), Charles Fritz (Gladiola CEO, now deceased), Daniel Shaw (Gladiola CEO), and Michael Rowan (AEG CEO, successor to Spinks). (*Id.*, ¶20(g)). In that capacity, Scalzo presented on behalf of AEG at investor meetings, developed and managed AEG's Utah operation, oversaw the design and construction of AEG's research and development systems and its five-ton-per-hour "CoalSwitch" plant. (*Id.*, ¶20(a)).

As AEG's Vice President of Engineering, McCarthy reported to Scalzo. (*Id.*, ¶26(g)). In that capacity, he produced mechanical engineering designs of machines, equipment, arrangement models, and participated in the overall development of the CoalSwitch process. (*Id.*, ¶26(a)).

Between the dates of McCarthy's and Scalzo's respective beginnings of their employment and June 2018, they were paid in conformity with, and pursuant to, their respective employment agreements with AEG. (*Id.*, ¶21, ¶27, ¶30).

## II.  **AEG Induces McCarthy and Scalzo to Agree to a Delayed Payday**

In June 2018, AEG's then-CEO, Richard Spinks, announced to McCarthy and Scalzo (among others) that AEG had cash-flow problems. (*Id.*, ¶30). He stated that they had no choice but to delay payroll until AEG raised additional funds. (*Id.*). In that announcement, Spinks assured McCarthy and Scalzo that they would be paid their full amounts due once AEG secured funding. (*Id.*). Spinks instructed McCarthy and Scalzo to continue their jobs and assured them that they would be paid. (*Id.*).

The import of the roles held by McCarthy and Scalzo, and the extent to which each of whom had integrated into those roles, were well understood by all parties involved — McCarthy and Scalzo, and the AEG executive team alike. (*Id.*, ¶20, ¶¶25-26). The pretense of needing to "raise[] additional funds" meant, and clearly communicated, a Hobson's Choice — either McCarthy and Scalzo would continue working, or AEG wouldn't be able to secure funding, leaving McCarthy and Scalzo without continued employment and unable to recover their back wages and expenses. (*Id.*, ¶30, ¶33, ¶¶45-47). As it would later become clear, the Hobson's Choice was indeed an intentionally contrived and exploited circumstance. (*Id.*, ¶¶30-33, ¶39, ¶¶45-48).

Induced to believe that their continued work would ensure the successful fundraising (and that their quitting would ensure its failure) McCarthy and Scalzo proceeded with their employment. (*Id.*, ¶33).

### III. McCarthy and Scalzo Continue Working and Withhold Wage Actions on AEG's False Pretenses

Over the next eight months, AEG accounted for, acknowledged, and repeatedly renewed its promise to pay McCarthy's and Scalzo's back wages and expenses. (*Id.*, ¶¶30-33, ¶45, ¶46). At no time did AEG ever acknowledge any success regarding its fund-raising, despite having successfully done so on at least two occasions (which were unknown to McCarthy and Scalzo at the time). (*Id.*, ¶32).

This remained status quo until McCarthy and Scalzo were suddenly terminated in February 2019. (*Id.*, ¶¶34-35). McCarthy was terminated on February 21, 2019 and was provided a written acknowledgment of the unpaid wages, backpay, and expense reimbursement in the amount of $101,599.54. (*Id.*, ¶34).

Scalzo was terminated on February 22, 2019. (*Id.*, ¶35). Four days later, AEG acknowledged Scalzo's unpaid wages, backpay, and expense reimbursement in the amount of $58,956.93 (omitting an additional sum of $1,159.82 owed) (*Id.*).

At no time did AEG tender payment to either McCarthy or Scalzo for any portion of the amounts owed. (*Id.*, ¶¶34-35).

All told, McCarthy and Scalzo worked without pay and funded their own expenses for eight months awaiting AEG's raising additional capital. (*Id.*, ¶30, ¶¶33-¶36). But as it turned out, AEG had indeed successfully secured additional funding during that time. (*Id.*, ¶32).

On May 12, 2019, McCarthy and Scalzo made a formal written demand for payment of all unpaid wages and business-related expenses described herein. (*Id.*, ¶44). To date, no money has been tendered. (*Id.*, ¶34-35).

## **STANDARD OF REVIEW**

A motion to dismiss for failure to state a claim under Fed.R.Civ.P. 12(b)(6) "should not be granted unless it appears certain that the plaintiff can prove no set of facts which would support its claim and would entitle it to relief. In considering a motion to dismiss, the court should accept as true all well-pleaded allegations and should view the complaint in a light most favorable to the plaintiff." *Mylan Labs., Inc. v. Matkari*, 7 F.3d 1130, 1134 (4th Cir.1993). On review of a motion to dismiss, a court must "draw all reasonable inferences in favor of the plaintiff." *Kensington Volunteer Fire Dep't, Inc. v. Montgomery Cty., Md.*, 684 F.3d 462, 467 (4th Cir. 2012).

Well-pleaded allegations require "more than labels and conclusions, and a formulaic recitation of a cause of action's elements will not do. Factual allegations must be enough to raise a right to relief above the speculative level..." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 545, (2007). A Plaintiff must merely "nudge [his] claims across the line from conceivable to plausible" to survive a Motion to Dismiss. *Id.* at 570. Pleading specifics is not required, "but only enough facts to state a claim to relief that is plausible on its face." *Id*. at 547; *see also Ashcroft v. Iqbal*, 556 U.S. 662 (2009).

## ARGUMENT

### I.    AEG is Subject to Obligations under the Utah Payment of Wages Act

The plain language of the Utah Payment of Wages Act (Utah Code § 34-28-1, *et. seq.*) and its related caselaw clearly demonstrate the Act's proper applicability to this case. AEG argues to dismiss this claim on the legal premise that the mere existence of an employee-employer contract causes the employment to be "expressly exempted" from the Act. (Doc. 18-1, p.7-8). This premise is incorrect, as employment is contractual in nature by definition and thus it would render the Act a dead letter. For the following reasons, McCarthy and Scalzo have valid claims under the Act.

### A.    The Utah Payment of Wages Act Prescribes Numerous Employer Obligations

The purpose of the Utah Wage and Hour Act is to "regulate[] Utah employers' payment of wages to their employees." *Smith v. Batchelor*, 832 P.2d 467, 469 (Utah 1992). It "imposes duties on the employer pertaining to notice and record keeping and the timely and regular payment of wages." *Action Elec. Co. v. Industrial Comm'n*, 636 P.2d 474, 477 (Utah 1981). As it pertains to this case, the Act prescribes employer obligations including:

- **Utah Code § 34-28-3** (requiring *inter alia* payment of wages on "regular intervals" no longer than "semimonthly"; statements of wage deductions if deductions are to be made; withholding of wages only on written authorization).

- **Utah Code § 34-28-4** (requiring notice to employees of the rate of pay and the day and place of payment upon hiring, or before any change thereto).

- **Utah Code § 34-28-5** (requiring, upon separation from payroll, unpaid wages due immediately and payment within 24 hours).

- **Utah Code § 34-28-6** (requiring the employer, in the event of a wage dispute, to give written notice to the employee of the amount of wages the employer concedes

to be due, and the employer shall pay such amount without condition within 24 hours).

A private right of action exists under the Act against employers that fail to comply with these obligations. Utah Code § 34-28-9.5.

In this case, McCarthy and Scalzo bring claims under this Act principally for AEG's failure to pay its back wages within 24 hours of separation (Utah Code § 34-28-5), as well as for its failure to provide notice of and tender the conceded portions of any disputed wages (Utah Code § 34-28-6) and any other violations to be found under the Act.

## B.  An Employment Agreement Does Not Exempt an Employer from its Obligations under the Act

To avoid liability under the Act, AEG depends on the opening line of the act, "None of the provisions of this chapter shall apply to...employment where an agreement exists between employer and employee providing for different terms of payment..." Utah Code § 34-28-1. (Doc. 18-1, p.8). AEG construes this language to exempt from the Act any and every employment relationship governed by an employment agreement. For three reasons, it is clear that AEG stretches this language much too far.

**First,** AEG relies on this language to the exclusion of another portion of the Act that renders its interpretation nonsense. Section 7 of the Act states "Nothing contained in this chapter shall in any way limit or prohibit the payment of wages or compensation at more frequent intervals, or in greater amounts or in full when or before due, <u>but no provisions of this chapter can in any way be contravened or set aside by a mutual agreement unless the agreement is approved by the division</u>." Utah Code § 34-28-7 (emphasis added).

AEG focuses exclusively on Section 1's exception language and makes no reference to Section 7. (Doc. 18-1, p.7-8). Nor does it offer any explanation to reconcile the logical flaw and internal inconsistency between its interpretation of Section 1 and the express language of Section 7.

Section 7 expressly prohibits contravention of the Act by an employment agreement. Utah Code § 34-28-7. Yet AEG reads Section 1 to mean that not only does the Act *permit* an agreement to contravene the Act, but that the employer is affirmatively *exempted* from the Act by doing so. Such an interpretation would render the Act useless and defeat its purpose. *State v. J.B. & R.E. Walker*, 116 P.2d 766, 770 (1941).

**Second**, AEG relies on *Action Elec. Co. v. Indus. Comm'n of Utah*, 636 P.2d 474 (Utah 1981), which construes the Act in dictum and without the benefit of analysis. (Doc. 18-1, p.8). This point was made clear by the Utah Supreme Court in the later case, *Zoll & Branch, P.C. v. Asay*, 932 P.2d 592, 594, n.3 (Utah 1997), in which the high court "expressly disavowed" the language of *Action Elec. Co.* — the language on which AEG depends.

This Court should instead look to the plain language of the Act to see that it contains no exception applicable to this case. Utah Code § 34-28-1 provides that the following employees or groups of employees are exempted from application of the statute:

> None of the provisions of this chapter shall apply to the state, or to any county, incorporated city or town, or other political subdivision, or to employers and employees engaged in farm, dairy, agricultural, viticultural or horticultural pursuits or to stock or poultry raising, or to household domestic service, or to any other employment where an agreement exists between employer and employee providing for different terms of payment...

The Act does not define the "different terms of payment" language, and there is little to no caselaw interpreting it. When read in conjunction with the preceding forms of employment (many of which traditionally involve non-pecuniary payment terms, e.g., room and board for household domestic service), the language's logical interpretation is that it would apply to arrangements involving other forms of non-pecuniary payment. Utah Code Ann. § 34-28-3. While the caselaw and the Act itself leaves unanswered the precise meaning of Section 1, it is express and clear that the language of Section 7 precludes the meaning AEG offers.

**Third**, even taking Defendants' interpretation as valid *arguendo* — that an agreed-upon contractual term may override the Act — AEG shows no out-of-the-ordinary payment term that might qualify the Plaintiffs' employment under its interpretation of Section 1. (Doc. 18-1, p.8). McCarthy and Scalzo had a run-of-the-mill employment agreement with AEG, which included terms for salary and expense reimbursement. (Doc. 1, ¶19, ¶25). No "term of payment" existed relating to the payment of wages upon separation to be sure (i.e., the chief complaint under the Act). McCarthy and Scalzo were terminated in February 2019. (*Id.*, ¶¶34-35). The Act required AEG to pay all wages owed within 24 hours of separation; even under AEG's interpretation of the law, AEG was obligated to that timeframe without a "term" to the contrary. AEG acknowledged the amounts owed but willfully failed to tender them. (*Id.*, ¶¶34-35, ¶78). Therefore, even taking AEG's interpretation at face value, it has no bearing on its liability under the Act.

## II. McCarthy's and Scalzo's Employment is Subject to the Fair Labor Standards Act

AEG seeks to avoid liability under the Fair Labor Standards Act ("**FLSA**") by arguing that McCarthy and Scalzo fall within the FLSA's exemptions. (Doc. 18-1, p.9-14).[3] This argument fails as explained below.

### A. Exemptions under the FLSA

The FLSA recognizes exemptions for certain employees including, e.g., executive, administrative, professional, and highly compensated employees. 29 U.S.C. § 213. AEG lumps the "executive" and the "learned professional" exemptions together and argues that McCarthy and Scalzo were exempt from the FLSA's protections on those grounds. (Doc. 18-1, p.9).

---

[3] In the same section of its brief, AEG raises a statute of limitations defense pertaining to the Utah Minimum Wage Act. This argument will be discussed in Section III.B. AEG raises no statute of limitations defense pertaining to the FLSA, and therefore, it will not be argued here. (*See* Footnote 7).

Case 7:21-cv-00025-D   Document 23   Filed 08/16/21   Page 11 of 24

Each exemption has its own criteria that must be met (29 C.F.R. § 541.100 − 541.600), and it is the employer's burden to establish each element of the exemptions "by 'clear and affirmative' evidence" before an employee is exempted from protection under the FLSA. *Aaron v. City of Wichita*, 54 F.3d 652, 657 (10th Cir. 1995)*; Corning Glass Works v. Brennan*, 417 U.S. 188, 196–97 (1974).

The exemptions under the FLSA which Defendants seek to apply are to be construed narrowly and against the employer. *Ellis v. J.R.'s Country Stores, Inc.*, 779 F.3d 1184, 1188 (10th Cir. 2015); *see also Chessin v. Keystone Resort Mgmt., Inc.*, 184 F.3d 1188, 1192 (10th Cir. 1999) ("In a case involving the FLSA, an employer bears the burden of proving…the applicability of an FLSA exemption; we must construe the exemption narrowly against the employer.").

The "executive" and the "learned professional" exemptions argued here similarly require a showing of specific duties (the "Duties Test") and a specific salary level (the "Salary-Level Test"). A side-by-side showing of the relevant language of each exemption is as follows:

| Executive Employees<br>29 C.F.R. § 541.100 *et. seq.* | Professional Employees<br>29 C.F.R. § 541.300 *et. seq.* |
|---|---|
| (a) The term "employee employed in a bona fide executive capacity" in section 13(a)(1) of the Act shall mean any employee:<br><br>(1) **Compensated on a salary basis pursuant to § 541.600 at a rate of not less than $684 per week**…<br><br>(2) Whose primary duty is **management of the enterprise in which the employee is employed or of a customarily recognized department** or subdivision thereof;<br><br>(3) Who customarily and **regularly directs the work of two or more other employees**; and<br><br>(4) Who has the **authority to hire or fire other employees** or whose suggestions and recommendations as to the hiring, firing, | (a) The term "employee employed in a bona fide professional capacity" in section 13(a)(1) of the Act shall mean any employee:<br><br>(1) **Compensated on a salary or fee basis pursuant to § 541.600 at a rate of not less than $684 per week**…<br><br>(2) Whose primary duty is the performance of work:<br><br>(i) **Requiring knowledge of an advanced type in a field of science** or learning customarily acquired by a prolonged course of specialized intellectual instruction; or<br><br>(ii) **Requiring invention, imagination, originality or talent in a recognized field** of artistic or creative endeavor.<br><br>29 C.F.R. § 541.300 |

| | |
|---|---|
| advancement, promotion or any other change of status of other employees are given particular weight.<br><br>29 C.F.R. § 541.100 | (a) To qualify for the learned professional exemption, an employee's primary duty must be the performance of work requiring advanced knowledge in a field of science or learning customarily acquired by a prolonged course of specialized intellectual instruction. This primary duty test includes three elements:<br><br>(1) The employee must perform work requiring **advanced knowledge**;<br><br>(2) The advanced knowledge must be in a **field of science or learning**; and<br><br>(3) The advanced knowledge must be customarily acquired by a **prolonged course of specialized intellectual instruction**.<br><br>29 C.F.R. § 541.301 |

For the following reasons, AEG has failed to meet its burden of establishing the proper applicability of either exemption.

### B.     The Duties Test is a Fact-Specific Inquiry, which AEG Fails to Satisfy

AEG fails to pass the Duties test for three reasons.

**First**, AEG fails to cite sufficient allegations to meet its burden. With respect to the Executive exemption, AEG cites no allegation showing McCarthy's or Scalzo's role managing an enterprise or department, or that they regularly directed the work of two or more employees, or that they had any input into the personnel decisions of AEG. (Doc. 18-1, p.9-15). Likewise, with respect to the Professional exemption, AEG cites no allegation showing that McCarthy's or Scalzo's roles included primary duties requiring advanced knowledge, or were devoted to a field of science or learning, or required advanced knowledge being acquired by prolonged courses of specialized intellectual instruction. (*Id.*)

**Second**, AEG depends on McCarthy's and Scalzo's titles and education (*Id.*, p.9-10), which become relevant only where the employer also shows that the position itself requires such

qualifications. *Young v. Cooper Cameron Corp.*, 586 F.3d 201, 206 (2d Cir. 2009) ("If a job does not require knowledge customarily acquired by an advanced educational degree...then, regardless of the duties performed, the employee is not an exempt professional under the FLSA."); *Radtke v. Lifecare Mgmt. Partners*, 795 F.3d 159, 165 (D.C. Cir. 2015) ("[I]t is the educational requirements of the job, not the education of the individual, that matter for the professional exemption.") (internal quotations and citations omitted).[4] AEG has failed to make such a showing.

**Third**, AEG cites cursory statements of work performed by McCarthy and Scalzo as grounds to qualify them for either exemption (e.g., "business negotiations," preparing "conceptual designs," and preparing an "engineering and a financial feasibility study"). (Doc. 18-1, p.10). Such an argument may be made only by drawing inferences unfavorable to McCarthy and Scalzo — inferences contrary to the standard of review on a motion to dismiss. *Kensington Volunteer Fire Dep't, Inc. v. Montgomery Cty., Md.*, 684 F.3d 462, 467 (4th Cir. 2012). The scope and detail of McCarthy's and Scalzo's job duties present a question of fact to be assessed and determined at a later stage and with the benefit of discovery. *Icicle Seafoods, Inc. v. Worthington*, 475 U.S. 709, 714, (1986). ("The question of how the [employees] spent their working time...is a question of fact."); *Radtke v. Lifecare Mgmt. Partners*, 795 F.3d 159, 165 (D.C. Cir. 2015) (holding that the issue of whether employees, who were employed as medical records coders, were exempt as administrative or professional employees from overtime pay requirement under the FLSA was for the jury).

---

[4] *See also, Dybach v. State of Fla. Dep't of Corrs.*, 942 F.2d 1562, 1565 (11th Cir.1991) ("[T]he determinative factor is the job requirement and not the education in fact acquired by the employee."); *Kadden v. VisuaLex, LLC*, 910 F.Supp.2d 523, 539–40 (S.D.N.Y.2012) (holding graphics consultant with law degree was not an exempt learned professional where job did not require advanced legal training); *Clark v. Centene Co. of Texas, L.P.*, 44 F. Supp. 3d 674 (W.D. Tex. 2014), aff'd, 656 F. App'x 688 (5th Cir. 2016) (A court's focus in analyzing the availability of the learned professional exemption to Fair Labor Standards Act (FLSA) overtime provisions is on the minimum requirements for the job.).

Consequentially, for all three aforementioned reasons, AEG fails to meet its burden of establishing the Duties test for either exemption.

### C.    The Salary-Level Test Requires *Actual* Compensation (not *Promises* of Compensation), which AEG Fails to Show

In addition to the Duties Test, an employer must show that an employee meets the Salary-Level Test. This test requires that the employee received at least $684 per week. 29 C.F.R. §§ 541.100, 541.200.

The Department of Labor went on to clarify the "Amount of salary required". In 29 C.F.R. § 541.600, the Department set forth, "To qualify as an exempt executive, administrative or professional employee[], an employee <u>must be compensated on a salary basis</u> at a rate of not less than $684 per week…" (emphasis added). In 2004, the Department of Labor specifically amended the regulation to define "salary basis." It states:

> An employee will be considered to be paid on a "salary basis" within the meaning of these regulations if the employee regularly <u>receives</u> each pay period on a weekly, or less frequent basis, a predetermined amount constituting all or part of the employee's compensation, which amount is not subject to reduction because of variations in the quality or quantity of the work performed.

29 C.F.R. § 541.602(a) (emphasis added).[5]

As a result of the update, the Salary-Basis Test is met depending on whether the employee is *actually* compensated at the proper rate and not whether the employment agreement calls for such compensation. 29 C.F.R. § 541.600 ("an employee must *be* compensated" (emphasis added)); 29 C.F.R. § 541.602 (the employee qualifies "if the employee regularly *receives* [] the employee's compensation" (emphasis added)).

---

[5] The update to the regulations is significant in that it narrows the salary basis to employees who actually received the salary. *Orton v. Johnny's Lunch Franchise, LLC*, 668 F.3d 843, 849 (6th Cir. 2012), cite with approval with respect to the salary-basis test in *Pioch v. IBEX Engineering Servs., Inc.*, 825 F.3d 1264 (11th Cir. 2016) (citing to approval with respect to the salary-basis test).

The 2004 clarification was explained in *Orton v. Johnny's Lunch Franchise, LLC*, 668 F.3d 843, 848 (6th Cir. 2012). In that case, the Sixth Circuit heard an argument regarding the employer's lack of cashflow and its consequential failure to pay wages. The court rejected the argument — along with other arguments — ultimately reversing the dismissal of the plaintiff's complaint and remanding the case back to the trial court. In doing so, the Sixth Circuit said:

> The new (2004) regulations, which all parties correctly agree are applicable in this case, establish that employment agreements are no longer the relevant starting point for whether an employee is paid on a salary basis. The question is therefore not what Orton was owed under his employment agreement; rather, the question is what compensation Orton actually received.

In cases where the employer fails to pay wages that *would have* met the requirement (had they been paid) the courts have quite straightforwardly held the employee does *not* qualify under the test. "In other words, it is insufficient for an employer-defendant to merely assert that, had the plaintiff-employee been receiving the compensation he or she was entitled to pursuant to an employment agreement, that employee would qualify for an exemption." *Traweek v. Glob. Sols. & Logistics LLC*, No. 2:14-CV-00308-LSC, 2015 WL 4545634, at *5 (N.D. Ala. July 28, 2015).

In such cases, the employee is deemed exempt during the periods that the employer pays the qualifying wages and non-exempt during the periods that it does not. *Edwards v. Clinical Rsch. Consultants, Inc.*, No. 2:15-CV-902-TMP, 2017 WL 2265834, at *9 (N.D. Ala. May 24, 2017) ("FLSA generally requires an examination of wages on a weekly basis...in the weeks when no salary was paid, ... the salary-basis test … [was not met and] in those weeks, [the employee is] nonexempt"). This application applies squarely to the case at hand.

In this case, AEG stopped paying McCarthy and Scalzo in June 2018 and continually failed to pay them through their termination. (Doc. 1, ¶30, ¶¶32-35, ¶39). Because they did not receive actual compensation during that period, they fail the Salary-Level Test as a matter of law; and therefore, AEG fails to establish that McCarthy or Scalzo qualify for either FLSA exemption.

**III.**    **AEG is Bound by the Utah Minimum Wage Act**

AEG seeks to avoid responsibility for its unpaid wages under the Utah Minimum Wage Act by arguing that the Act attaches to, and comes and goes with, the FLSA. (Doc. 18-1, p.9-14). It argues that, because the Plaintiffs' FLSA claims should be dismissed — a failing argument, as discussed above — so should (necessarily) the Utah Minimum Wage Act claims. AEG then argues that the statute of limitations for the Utah Minimum Wage Act claim has expired. (Doc. 18-1, p.14-15).

For the reasons below, both positions fail.

**A.**    **The Utah Minimum Wage Act Expressly Applies in the *Alternative To* (Not in *Tandem With*) the FLSA**

The Utah Minimum Wage Act states in Section 104 that, "(1) The minimum wage established in this chapter <u>does not apply to</u>: (a) <u>any employee who is entitled to a minimum wage as provided in</u> [] <u>the Fair Labor Standards Act</u>..." Utah Code § 34-40-104. Thus, the Act could not be more clear: it does *not* apply where the FLSA applies.[6]

Despite the clear intent to *grant* an action where one does not lie under the FLSA, AEG appears to take the position that the Act intends to do the exact opposite: to *preclude* a cause of action under the same circumstances (where the FLSA does not apply).

AEG's position depends solely (and erroneously) on the opening line of the Utah Minimum Wage Act: "this chapter and the terms used in it, including the computation of wages, shall be interpreted consistently with the Fair Labor Standards Act[] to the extent that act relates to the payment of a minimum wage..." Utah Code § 34-40-102. (Doc. 18-1, p.9). In coming to their interpretation, AEG stretches this language much too far.

_____

[6] *Beltran v. Interexchange, Inc*, No. 14-CV-03074-CMA-KMT, 2016 WL 695967, at *15 (D. Colo. Feb. 22, 2016), *report and recommendation adopted in part, rejected in part sub nom. Beltran v. InterExchange, Inc.*, 176 F. Supp. 3d 1066 (D. Colo. 2016); *In re Wal-Mart Wage & Hour Emp. Pracs. Litig.*, 490 F. Supp. 2d 1091, 1127 (D. Nev. 2007).

The effect of AEG's interpretation is that the Utah Minimum Wage Act precludes itself where the FLSA *does* and *does not* apply alike. It is patently incredulous as it would obviate the Act altogether. AEG's interpretation simply cannot stand.

**B.     Statute of Limitations**

AEG next raises the statute of limitations as a defense to McCarthy's and Scalzo's Utah Minimum Wage Act claims. (Doc. 18-1, p.14-15). This defense fails for two reasons. First, AEG's wrongdoing and unjust conduct invites the application of the equitable estoppel doctrine. Second, AEG's promises and acknowledgements of its debt of wages renews its statute of limitations under Utah Code § 78B-2-113.[7]

**1.     Equitable Estoppel / Tolling**

The doctrine of Equitable Estoppel "comes from the 'maxim that no man may take advantage of his own wrong.'" *Fitzgerald v. Spearhead Invs., LLC*, 2021 UT 34, ¶ 17 (Utah 2021). It is applied when a "defendant has unjustly 'lull[ed] an adversary into a false sense of security thereby subjecting his claim to the bar of limitations' and is then 'heard to plead that very delay as a defense to the action when brought.'" *Id.* The doctrine contains three elements:

> (1) a statement, admission, act, or failure to act by one party inconsistent with a claim later asserted;
>
> (2) reasonable action or inaction by the other party taken on the basis of the first party's statement, admission, act, or failure to act; and
>
> (3) injury to the second party that would result from allowing the first party to contradict or repudiate such statement, admission, act, or failure to act.

---

[7] AEG raises no statute-of-limitations defense to McCarthy's or Scalzo's FLSA claims, and therefore it will not be addressed here. Should the Court consider it *sua sponte,* the limitations period under the FLSA is three years in the event of a willful violation of the FLSA. McCarthy and Scalzo allege willfulness by AEG and the other defendants throughout the Complaint. (Doc.1, ¶30, ¶32, ¶¶45-48). 29 U.S.C. § 255(a). *McLaughlin v. Richland Shoe Co.*, 486 U.S. 128, 133 (1988) (an employer's violation of the FLSA is willful if the employer either "knew or showed reckless disregard for the matter of whether its conduct was prohibited by" the FLSA).

Case 7:21-cv-00025-D    Document 23    Filed 08/16/21    Page 18 of 24

*Id.* at ¶18.

This doctrine may be invoked "even when the plaintiff is aware of the facts giving rise to a cause of action." *Id.* at ¶19. It "merely requires that a 'party has been induced to refrain from using such means or taking such action as lay in his power, by which he might have retrieved his position and saved himself from loss." *Id.* However, a "mere reiteration of a preexisting promise, much like the initial promise, cannot be sufficient to toll a limitations period because it would obviate the purpose of the statute of limitations defense and its equitable estoppel exception." *Id.* at ¶27. [8]

This doctrine justly applies here as the facts satisfy each of the three elements.

(1) AEG affirmatively misrepresented false pretenses as to its inability to make its wage payments, it lied about the conditions upon which wages would be paid, it failed to honor is promises to pay back wages upon that condition (or even reveal its obligation to do so), and it ongoingly induced additional unpaid work by re-affirming the wages owed which it never intended to pay. (Doc.1, ¶30, ¶32, ¶36). AEG went far beyond a "mere reiteration of a preexisting promise." *Fitzgerald v. Spearhead Inves., LLC*, 2021 UT 34, ¶ 27 (Utah 2021). It induced the Plaintiffs' ongoing unpaid work on the one hand, while it simultaneously depleted and prepared to transfer its assets out of state and into alter egos on the other. (Doc. 1, ¶¶30-33, ¶¶37-41).

(2) By virtue of the false statements, AEG induced McCarthy and Scalzo to refrain from taking action on their wage claims and, even more, induced additional work performance without payment during the interim eight months. (*Id.*, ¶30-33).

---

[8] *Born v. Progrexion Teleservices, Inc.*, No. 2:20-CV-00107, 2020 WL 5803320, at *2 (D. Utah Sept. 29, 2020); *Cruz v. Maypa*, 773 F.3d 138, 146–47 (4th Cir. 2014) (applying equitable tolling doctrine as to FLSA claim).

McCarthy and Scalzo only continued their work without pay as a result of having been induced to do so.[9]

    (3)   By the time AEG revealed its scheme and terminated the Plaintiffs, it had depleted or transferred all local assets to unknown locations, and it caused McCarthy and Scalzo to refrain from taking legal action for approximately one third of their statutory period for doing so. (*Id.*, ¶¶34-41). It was a twofold setback: first, a legal head start for AEG to avoid its liabilities and, second, a shortened limitations period for McCarthy and Scalzo to catch up. Today, AEG seeks to use that shortened limitations period as its defense to its liability.

McCarthy and Scalzo were paid far below minimum wage — zero dollars over the span of eight months. (*Id.*, ¶30, ¶¶32-35, ¶85). AEG should not be permitted to take advantage of its own wrongs by asserting a limitations defense after "lull[ing] an adversary [Plaintiffs] into a false sense of security" and inducing them to refrain from acting on their claims at an earlier time, and thereby shortening the very window it seeks to assert as a defense. *Fitzgerald v. Spearhead Inves., LLC*, 2021 UT 34, ¶ 17 (Utah 2021).[10]

### 2.    <u>AEG's Promises to Pay the Debt Renew the Statute of Limitations</u>

Utah Code § 78B-2-113 states, "An action for recovery of a debt may be brought within the applicable statute of limitations from the date [*inter alia*] <u>a written acknowledgment of the debt or a promise to pay is made by the debtor</u>." (Emphasis added). Under Utah law, an acknowledgment of debt that is sufficient to toll statute of limitations need not expressly state the

---

[9] It would be unreasonable to infer that McCarthy and Scalzo would have continued to work for eight months, unpaid, without having been induced to do so.

[10] Discovery will yield the details of AEG's announcements and memos related to its delayed wages, thereby illuminating the scope of and extent to which AEG intentionally and knowingly lied to induce the performance of free labor and avoid the payment of back wages.

intention of acknowledging such debt. B*uxton v. Diversified Resources Corp.*, 634 F.2d 1313, (10th Cir. 1980). Instead, the acknowledgment is sufficient if the purported acknowledgment is in such terms as to communicate this concept or thought to the person receiving it. *Id.*

On February 21, 2019, AEG acknowledged in a writing from its Controller Jason Owens and CFO Duncan Nealy, that it owed McCarthy $101,599.54. (Doc. 1, ¶34). Likewise, on February 26, 2019, then AEG CEO Michael Rowan acknowledged in a writing that it owed Scalzo $58,956.93. (*Id.*, ¶35). These communications were consistent with AEG's ongoing assurances of its obligation and willingness to pay the back wages owed. (*Id.*, ¶30, ¶35, ¶46). Because these writings expressed to McCarthy and Scalzo the acknowledgment of a debt owed, they are sufficient to renew the statute of limitations.

## IV.  **Attorney's Fees**

AEG argues that, because each of the aforementioned Utah-based wage claims should be dismissed, McCarthy's and Scalzo's claim for their attorney's fees should be dismissed. But for the reasons stated above, said claims should survive AEG's Motion to Dismiss, and therefore, so should McCarthy's and Scalzo's claim for attorney's fees under Utah Code § 34-27-1.

## **CONCLUSION**

For the foregoing reasons, the Motion to Dismiss should be denied in its entirety.

This the 16th day of August 2021.

**Williams & Ray, PLLC:**
*Attorneys for Plaintiffs*

Brycen G. Williams
NC Bar No.: 50253
    Williams & Ray, PLLC
    555 Fayetteville St., Ste. 201
    Raleigh, NC 27601
    Phone: (888) 315-3841

Fax:    (303) 502-5821
Email: bw@williamsray.com

## **CERTIFICATE OF SERVICE**

The undersigned hereby certifies that the foregoing document has been duly served on all counsel of record by filing it with the Clerk of the Court using the CM/ECF System.

**Williams & Ray, PLLC:**
*Attorneys for Plaintiffs*

Brycen G. Williams
NC Bar No.: 50253
    Williams & Ray, PLLC
    555 Fayetteville St., Ste. 201
    Raleigh, NC 27601
    Phone: (888) 315-3841
    Fax:   (303) 502-5821
    Email: bw@williamsray.com

## CERTIFICATE OF WORD COUNT

The undersigned hereby attests, in reliance on the word count generated by word processing software, that the foregoing memorandum complies with the applicable word and page limit under Local Rule 7.2(f)

**Williams & Ray, PLLC:**
*Attorneys for Plaintiffs*

Brycen C. Williams
NC Bar No.: 50253
  Williams & Ray, PLLC
  555 Fayetteville St., Ste. 201
  Raleigh, NC 27601
  Phone:    (888) 315-3841
  Fax:        (303) 502-5821
  Email:    bw@williamsray.com